WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Louie Anthony Rangel, Jr., | No. CV 16-0091-TUC-BPV |
| Plaintiff, | **ORDER** |
| v. | |
| Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Louie Anthony Rangel, acting *pro se,* has filed the instant action pursuant to 42 U.S.C. § 405(g) seeking review of the final decision of the Commissioner of Social Security. (Doc. 1). The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent. (Doc. 11). *See* 28 U.S.C. § 636(c). Pending before the Court are Plaintiff's Opening Brief (Doc. 16), Defendant's Brief (Doc. 17), and Plaintiff's Reply Brief[1] (Doc. 21). For the following reasons, the Court remands this matter for further proceedings.

## I.  PROCEDURAL HISTORY

On February 16, 2012, Plaintiff protectively filed applications for disability and disability insurance benefits. (Transcript/Administrative Record ("Tr.") 20, *see also* Tr. at 166-71). Plaintiff alleged disability as of June 15, 2011 due to hypertension, anxiety, and depression. (Tr. at 166, 196). Plaintiff's applications were denied initially and upon

---

[1] Plaintiff's Reply brief is also captioned as "Plaintiff's Opening Brief". (*See* Doc. 21).

reconsideration. (Tr. 101-04, 112-19; *see also* Defendant's Brief at 2 n. 1). Upon Plaintiff's request for hearing, Administrative Law Judge ("ALJ") Nancy M. Stewart held a hearing in San Diego, California, on March 6, 2014, where Plaintiff who was represented by counsel, and a vocational expert testified. (Tr. 37-72). On April 30, 2014, the ALJ issued her decision denying Plaintiff's request for benefits. (Tr. 21-31). Thereafter, the Appeals Council denied Plaintiff's request for review (Tr. 1-7), making the ALJ's decision the Commissioner's final decision for purposes of judicial review. Plaintiff then initiated the instant action.

## II. PLAINTIFF'S BACKGROUND

Plaintiff was born on January 29, 1959 and was 55 years of age as of the date of the hearing. (Tr. at 44-45[2]). Plaintiff completed school through "a couple of classes" in the ninth grade and "didn't really go to school in junior high actually." (Tr. at 45). All of Plaintiff's prior work, from 1977 through June 15, 2011, has been in construction, primarily pouring and finishing concrete or as a labor foreman. (Tr. at 207-201; *see also id.* at 63 (describing concrete work as "all knee work. . . .[Y]ou get on kneeboards.").

Plaintiff stated that he grew up in a violent home with "an alcoholic, bipolar father[]" (Tr. at 384), and that his sister attempted suicide in the past, (Tr at 327). At the time of the hearing, Plaintiff lived with his wife and his 11-year-old autistic son. (Tr. 50-51, 407). The record also reflects that during some of the relevant period, Plaintiff also lived with his mother. (*See* Tr. at 222).

Plaintiff stated that he could no longer work because "people bug me and depression [sic] really bad. [T]o[o] many meds [sic] high blood pressure. Don't like people speeding. Don't trust no one." (Tr. at 218). Plaintiff testified that he has headaches and dizziness every time he gets up from the couch. (Tr. at 46). He also experiences head rushes if he bends down to pick up something. (Tr. at 47). He

---

[2] At the hearing, Plaintiff clarified that he was born in 1959, not 1958 as reflected in the record. (Tr. at 44; *see also* Tr. at 166 (reflecting 1958 birthdate)). Nonetheless, the ALJ's decision reflects that Plaintiff was "born on January 29, 1958 and was 53 years old…on the alleged disability onset date." (Tr. at 29).

experiences shortness of breath and uses inhalers for asthma. (Tr. at 49, 56). He stops breathing when he is sleeping, which wakes him up, and his insurance will not cover a sleep study. (Tr. at 48-49).

Plaintiff's back and knees ache. (Tr. at 46). Plaintiff's knees hurt if he walks too much and become stiff if he sits too much. (Tr. at 53; *see also* Tr. at 274 (Plaintiff's knees hurt when he walks)). He can sit for ten minutes at most because of his knees and his racing thoughts. (Tr. at 54 (he cannot sit still)). He can only stand for about as long as it takes to make a sandwich because of dizziness and aching knees and legs. (TR. at 55). His asthma makes it difficult to walk more than 800 feet. (Tr. at 56; *see also* Tr. at 227 (Plaintiff indicated he could walk one block before needing to rest for about five minutes)).

Plaintiff becomes ill if he experiences stress and he "snap[s] a lot too. I was diagnosed with bipolar, so I've got my little mood swings." (Tr. at 47; *see also* Tr. at 58 (Plaintiff has "mood swings" where he becomes "really angry and then I'll snap.")). Plaintiff also experiences panic attacks despite his medication for same. (Tr. at 47). He becomes anxious when driving and "can't put up with traffic….I get real, real nervous. An anxiety attack or something." (Tr. at 51) When he is having a panic attack, Plaintiff has difficulty breathing, he sweats, and his "blood pressure goes up, heart pounding." (Tr. at 57). When he is having a panic attack, he has to lie down and "rest my mind. If I rest my mind, I'm okay for a little while." (Tr. at 58).

Plaintiff testified that has difficulty being around a lot of people, loud sounds, or lights. (Tr. at 57). He does not trust people. (*Id.*). Even at home, he stays to himself for long periods of time. (Tr. at 58). However, he does like being around his wife and son, "[b]ut if it is somebody else, I don't like being around them. I'll go in my room. The TV's on, little kids, that's stuff that bugs me and I can't cope with it." (Tr. at 59). Plaintiff does not engage in social activities because he is "[a]lways depressed" and does not trust anyone. (Tr. at 227). Plaintiff also testified that about three times a week, he sees things that he describes as "something black that's not there or something dark" and

he hears mumbling. (Tr. at 56-57).

Plaintiff's medications include inhalers for asthma, and dipropionate, hydrochlorothiazide, lisinopril, amlodipine besylate, and losartan for high blood pressure. (Tr. at 258; *see also* Tr. at 738). Medications for depression, mood, anxiety, and bi-polar disorder include Cymbalta, clonazepam, and Abilify. (Tr. at 258, 738; *see also* Tr. at 407 (Plaintiff has also taken Risperdal for mood stabilization)). He has also been prescribed trazodone for insomnia. (*Id.*).

## III. THE ALJ'S DECISION

### A. CLAIM EVALUATION

Whether a claimant is disabled is determined pursuant to a five-step sequential process. *See* 20 C.F.R. §§404.1520, 416.920. To establish disability, the claimant must show that: (1) he has not performed substantial gainful activity since the alleged disability onset date ("Step One"); (2) he has a severe impairment(s) ("Step Two"); and (3) his impairment(s) meets or equals the listed impairment(s) ("Step Three"). *Id.* "If the claimant satisfies these three steps, then the claimant is disabled and entitled to benefits. If the claimant has a severe impairment that does not meet or equal the severity of one of the ailments listed…, the ALJ then proceeds to step four, which requires the ALJ to determine the claimant's residual functioning capacity (RFC)[3]….After developing the RFC, the ALJ must determine whether the claimant can perform past relevant work…. If not, then at step five, the government has the burden of showing that the claimant could perform other work existing in significant numbers in the national economy given the claimant's RFC, age, education, and work experience." *Dominguez,* 808 F.3d at 405.

### B. The ALJ's Findings in Pertinent Part

The ALJ determined that Plaintiff "has the following severe impairments: asthma; affective disorder; high blood pressure; headaches; osteoarthritis of the bilateral knees, right worse than left knee which is mild; and obesity[.]" (Tr. 22 (stating that Plaintiff's

---

[3] "The RFC is defined as 'the most' the claimant can do, despite any limitations." *Dominguez v. Colvin*, 808 F.3d 403, 405 (9th Cir. 2015), *as amended* (Feb. 5, 2016) (citation omitted).

"sleep apnea and history of alcohol abuse in remission are non severe impairments because they do not cause the claimant more than mild limitations.")). In making her decision, the ALJ also considered the impact of Plaintiff's obesity[4] "in conjunction with his knee impairments." (Tr. 28). The ALJ found that Plaintiff had the RFC

> to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except lift and carry 25 pounds frequently and 50 pounds occasionally; pushing and pulling within those weight limits, occasionally as to the lower extremities; no foot pedals as to the right extremity; stand and/or walk 6 hours in an 8 hour workday, no prolonged walking greater than 2 hours at a time; sitting 6 hours in an 8 hour workday; ability to stand and stretch not to exceed 10% of the time; no ladders, ropes or scaffolds; no work hazards such as working at unprotected heights, operating dangerous or fast moving machinery or driving commercial vehicles; no respiratory irritants or temperature extremes; postural activity can be performed on an occasional basis; occasional contact with the public, coworkers and supervisors; unskilled work involving simple routine tasks; and no fast paced work in a static work environment.

(Tr. 26). Based upon the vocational expert's testimony at the hearing, the ALJ determined that Plaintiff was unable to perform his past work as a concrete stone finisher. (Tr. 29). The ALJ relied on the vocational expert's testimony to further determine that Plaintiff would be able to perform other work such as: linen room attendant, *Dictionary of Occupational Titles* ("DOT") 222.387-030; laundry worker I, DOT 361.684-014; and shoe cleaner, DOT 788.687-122. (Tr. 30). Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act from June 15, 2011 through the date of the ALJ's decision. (*Id.*).

## IV. DISCUSSION

Plaintiff argues that the Appeals Council erred by failing to consider new evidence (*See* Complaint at 2; *see also* Defendant's Brief at 5-6) and that the ALJ erred by: (1) omitting evidence from a nurse practitioner; (2) rejecting Plaintiff's treating psychiatrist's opinion; (3) "giving her opinions on matters outside her area of expertise"; and (4) discounting Plaintiff's credibility. (Plaintiff's Opening Brief at 1-3). Defendant counters

---

[4] In 2014, Plaintiff, who is 5 feet 8 inches tall, weighed 240 pounds and his body mass index was 36.4 (Tr. 724).

that Plaintiff's new evidence does not justify a remand for further administrative proceedings. Defendant also argues that the ALJ's decision is supported by substantial evidence in the administrative record and should be affirmed.

### A. STANDARD

The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Matney,* 981 F.2d at 1019. However, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett,* 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)). Rather, the court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Id.; Garrison v.*

*Colvin,* 759 F.3d 995, 1009 (9th Cir. 2014). The court shall "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

## B. NEW EVIDENCE

While Plaintiff's request for review was pending before the Appeals Council, Plaintiff submitted additional records. (*See* Tr. at 1-6). Although the Appeals Council accepted and considered some of the evidence, it declined to accept evidence from 2015 because the ALJ "decided your case through April 30, 2014. This information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before April 30, 2014." (Tr. at 2; *see also* Tr. at 6). The Appeals Council also advised that Plaintiff could file a new application for benefits if he wanted the Commissioner to consider whether he was disabled after April 30, 2014. (Tr. at 2). The evidence the Appeals Council declined was not made part of the administrative record.

Plaintiff alleges that the Appeals Council erroneously rejected a form from a doctor because it was dated 2015. (Complaint at 2). To better assess Plaintiff's claim that evidence was improperly omitted, the Court directed Plaintiff to submit the 2015 evidence that the Appeals Council rejected. (*See* Docs. 22, 24). Plaintiff initially filed documents that did not appear to encompass the evidence submitted to the Appeals Council and he requested an extension to submit the appropriate documents because he had been unable to fully view the Court's order permitting him to file that evidence. (Doc. 26). The Court granted the requested extension. (Doc. 24). Thereafter, Plaintiff submitted documents consisting of: a four-page form, dated August 18, 2015, from Dr. Daniell requesting that Plaintiff be assessed as seriously mentally ill ("SMI"); an August 19, 2015 letter indicating that Plaintiff has been approved for SMI services; other August 2015 documentation concerning verification of Plaintiff's SMI determination; and an October 15, 2015 letter from recovery coach Jordan Picrom indicating that Plaintiff "currently receives services" at COPE Community Services ("COPE") and that Plaintiff

has been diagnosed with bipolar affective disorder and agoraphobia with panic attacks. (Doc. 26).

When Plaintiff's matter was pending before the Appeals Council, the regulations provided that: "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge decision." 20 C.F.R. §§404.970(b)(1), 416.1476(b)(1).[5] The Appeals Council's decision to reject the 2015 records submitted by Plaintiff comported with the applicable regulations.

Where the plaintiff presents new evidence to the district court during the course of his appeal, the court may remand the case to the Commissioner to take additional evidence pursuant to sentence six of 42 U.S.C. 405(g), "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding…." 42 U.S.C. § 405(g). Plaintiff bears the burden of showing good cause exists for the failure to submit the evidence in a timely fashion. *Clem v. Sullivan,* 894 F.2d 328, 332 (9th Cir. 1990). Evidence is material if it bears "directly and substantially on the matter in dispute." *Burton v. Heckler,* 724 F.2d 1415, 1417 (9th Cir. 1984). Plaintiff can establish good cause by showing he could not have obtained or submitted the evidence before the Commissioner issued a final decision. *Key v. Heckler,* 754 F.2d 1545, 1551 (9th Cir. 1985). "At a minimum, such evidence must be probative of mental or physical impairment." *Id.* (citation omitted). "A claimant does not meet the good cause requirement simply by obtaining a more favorable report from an expert witness once his claim is denied." *Clem,* 894 F.2d at 332.

In addition to the 2015 records the Appeals Council rejected, Plaintiff also submitted to this Court other records from 2011, 2014 and 2015[6], primarily from COPE.

---

[5] The regulations have since been amended. The Court applies the regulations in effect at the time Plaintiff's action was pending before the Commissioner.

[6] The 2015 record is duplicative of one previously rejected by the Appeals Council regarding the August 2015 SMI determination. (Doc. 23 at 3, Doc. 26 at 7).

(*See* Doc. 23).  Some of the 2014 records are duplicative of those contained in the administrative record, but others are not.  The 2014 COPE treatment notes reflect that Plaintiff's wife reported that he "continue[d] to be unmanageable and…paranoid[]" (Doc. 23 at 6 (April 2014)); Plaintiff exhibited poor concentration on mental status examination (*Id.* at 9 (February 2014)); Plaintiff's speech was pressured, his mood was anxious, and he reported he sees shadows at night and hears voices (*Id.* at 11 (January 2011)); Plaintiff "appeared to have some memory difficulty" when discussing medication review (*Id.* at 12 (January 2014)); and Plaintiff denied "suicidality at present but reports he does have suicidal thoughts 'sometimes'" and noting Plaintiff's flat  affect, pressured speech, anxious mood, limited insight/judgment and that he has hallucinations, seeing shadows and things moving (Doc. 23 at 14 (January 2011)).  In sum, the records are probative of Plaintiff's mental impairment and symptom allegation, as well as treating Dr. Caplin's opinion.  *See e.g., Key,* 754 F.2d at 1551.  However, Plaintiff has not explained why the 2011 and 2014 records were not previously submitted to the ALJ or the Appeals Council. Nonetheless, as discussed below, the Court has determined to remand this matter pursuant to sentence four of §405(g) on an open record for other reasons.  In light of Plaintiff's *pro se* status, and because the matter will be remanded on an open record for other reasons and the records submitted here are material to Plaintiff's claim, remand is also appropriate under sentence six of §405(g) for the ALJ to consider these records on remand.

### C.  NURSE PRACTITIONER'S EVIDENCE

Plaintiff alleges that the ALJ "would not look at any of the mental health evidence provided because it was signed by a N.P." (Complaint at 2).  He argues that "[e]vidence was omitted regarding [his] mental health by the ALJ Judge Nancy M. Stewart, he had been seen by a Nurse Practitioner not a Medical Doctor." (Plaintiff's Opening Brief at 1).

At the hearing, Plaintiff's attorney referred the ALJ to a February 24, 2014 record from Dale Hawking, Physician Nurse Practitioner at COPE, which informed that Plaintiff

was being evaluated for a SMI determination. (Tr. 42 (referring to exhibit B17-F which is at Tr. 693[7])). The ALJ responded that a Physician Nurse Practitioner is "not an acceptable medical source, but it is a medical professional and goes to the weighting and all that." (Tr. 43).

Social Security regulations place medical professionals into two different categories: "acceptable" medical sources and "other" medical sources. 20 C.F.R. §§404.1513(a),(d), 416.913(a),(d)[8]. A nurse practitioner falls within the "other source" category. *See Popa v. Berryhill,* __ F.3d. __, 2017 WL 4160041, at *5 (9th Cir. August 18, 2017), *as amended* (September 20, 2017) ( "The Social Security regulations provide an out-dated view that considers a nurse practitioner as an 'other source.'"); *see also Molina v. Astrue,* 674 F.3d 1104, 1111 (9th Cir. 2012) ("'other sources…are not entitled to the same deference[]" as acceptable medical sources)). The ALJ must "provide 'germane reasons' to reject [a nurse practitioner's]…opinions[;]" *Popa,* __ F.3d at __, 2017 WL 4160041, at *5, whereas, a more stringent standard is applied to rejection of opinions from "acceptable medical sources". Consistent with the regulations, the ALJ's statement appears merely to reflect that a nurse practitioner is not considered to be an "acceptable medical source[]" as defined by the regulations. The ALJ's decision does not indicate that she refused to consider any evidence merely because it came from a nurse practitioner.

With regard to the specific record by NP Hawking that was discussed at the hearing, the attorney stated that the SMI determination had not been completed and that

---

[7] On February 24, 2014, NP Hawking wrote a letter indicating "[w]e are currently in the process of doing an SMI (severely mentally ill) determination for this patient." (Tr. at 693). He also stated that he had been treating Plaintiff since 2014, Plaintiff had been treated at COPE in 2005, and Plaintiff has a history of panic attacks, depression and mood instability. (*Id.*).

[8] Social Security Regulations regarding medical evidence rules were amended effective March 27, 2017. *See* Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 19, 2017). "Where, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision." *Rose v. Berryhill,* 2017 WL 2562103, at *2 (C.D. Cal. June 13, 2017) (citations omitted). Accordingly, citations to the regulations throughout this Order are to the version in effect on April 30, 2014.

she thought it would be "forthcoming within probably 30 days. They're scheduling everything." (Tr. 43). The ALJ responded in pertinent part: "Okay, cause I can't hold the record open for something that hasn't been done yet." (*Id.*). That conversation occurred on March 6, 2014, the ALJ's decision issued on April 30, 2014. No SMI determination was submitted to the ALJ between the hearing date and the date the ALJ issued her decision.[9]

After the ALJ issued her decision, Plaintiff submitted to the Appeals Council updated treatment records and other documents he believed would support his claim. (*See* Tr. at 1-6). Although the Appeals Council considered several of the documents Plaintiff submitted it declined to accept and consider records dated after the ALJ's decision.[10] (*See* Tr. at 2).

Plaintiff argues that "Cope omitted papers [sic] years of records from Nurse Practitioner only one on record." (Plaintiff's Opening Brief at 2 (citing Tr. 693)). Defendant responds that Plaintiff is presumably referring to Nurse Practitioner Hawking's statement that Plaintiff received mental health treatment at COPE "'back to 2005 or so as well.'" (Defendant's Brief at 12 (quoting Tr. 693)). The record does contain some records from various providers dating back to 2005 and before. (*See e.g.,* 347, 351-354, 356-94; *see also* 350 (August 2001 prescriber log)).

An "ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir. 2005). The Court agrees with Defendant to the extent that treatment records

---

[9] The record before the ALJ contained a February 2010 form for SMI determination that was completed by Victoria Homersmith indicating that Plaintiff qualified for designation as seriously mentally ill due to a "major disruption of role functioning." (Tr. 419-20). However, the area on the form for a "Final SMI Eligibility Determination" is not completed and no final determination with regard to this request appears in the record.

[10] Among the records rejected by the Appeals Council was an August 2015 determination that Plaintiff qualified as seriously mentally ill. (Plaintiff's Omitted Evidence (Doc. 26) (indicating that application for the SMI determination had been made on August 18, 2015 by Dr. Laura Daniell)).

from 2005 would likely have limited probative value in light of Plaintiff's June 15, 2011 alleged onset date.[11]  Moreover, the current record reflects Plaintiff's history, including his longstanding diagnoses of depression and anxiety, prior to the alleged onset date. (*See e.g.,* Tr. 350 (August 2001 prescription activity log noting diagnoses of depression, anxiety disorder, and polysubstance abuse by history)), Tr. 367 (June 23, 2005 working diagnoses of panic disorder without agoraphobia, alcohol abuse, rule out bipolar disorder, and noting "emergence of agoraphobia"); Tr. 375-95 (June 28, 2005 record including Behavioral Health and Medical History Questionnaire, Core Assessment, Mental Status Examination, and Clinical Formulation and Diagnoses), Tr. 363-65 (June 30, 2005 diagnoses of anxiety disorder, rule out panic disorder with agoraphobia, depressive disorder, history of alcohol abuse, past history of amphetamine, cocaine abuse)).  The ALJ also stated that "[t]o give the claimant every benefit of the doubt, I have considered all of the claimant's records, including those for treatment prior to his alleged onset date in order to determine his impairments and functioning from his alleged onset date to present."  (Tr. at 24).  On the instant record, there is no indication that the 2005 COPE records were not obtained because they were authored by a nurse practitioner. Consequently, the record does not support Plaintiff's contention that the ALJ erred by declining to consider evidence for the reason that it came from a nurse practitioner.

### D.    TREATING DOCTOR'S OPINION REGARDING MENTAL IMPAIRMENTS

Plaintiff challenges the ALJ's decision to reject treating psychiatrist Olga Caplin's opinion.

#### 1.    STANDARD

Medical opinions and conclusions of treating doctors are accorded special weight because treating doctors are in a unique position to know claimants as individuals, and

---

[11] Defendant argued that the 2005 records "would have very limited probative value in light of Plaintiff's claim that his symptoms did not become disabling for more than five years after his treatment ended."  (Defendant's Brief at 13).  However, although Defendant suggests that Plaintiff did not claim his symptoms were disabling before 2011, the record reflects that in June 2005, Plaintiff reported he had "applied for disability but was denied."   (Tr. 366; *see also* Tr. at 46 (ALJ stating that Plaintiff "filed prior applications in 2009.  They were denied and you didn't pursue a court hearing.").

because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A treating physician's opinion is entitled to substantial weight.") (internal quotation marks and citation omitted); *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir. 1987); 20 C.F.R. §§ 404.1527, 416.927.

A treating physician's medical opinion "is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical laboratory diagnostic techniques and is not inconsistent with the other substantial evidence [in the claimant's] case record.'" *Trevizo v. Berryhill,* __F.3d __, 2017 WL 4053751, at *7 (9th Cir. Sept. 14, 2017) (quoting 20 C.F.R. §404.1527(c)(2)); *see also Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007) (same)); 20 C.F.R. § 416.927(c)(2). When the treating doctor's opinion is not given controlling weight, "it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Trevizo,* __ F.3d. at __, 2017 WL 4053751, at *7 (citing 20 C.F.R. at 404.1527(c)(2)-(6); *see also* 20 C.F.R. § 416.927(c)(2)); *see also* SSR 96-2P, 1996 WL 374188, *4[12] ("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."). Thus, even

---

[12] In light of new rules effective March 27, 2017, the Commissioner rescinded SSR 96-2P. *See* Notice regarding Rescission of Social Security Rulings 96-2P, 96-5P, AND 06-3P, 2017 WL 3928298 (March 27, 2017). However, the ruling applied at the time the ALJ rendered his decision and discusses the regulations governing claims, like Plaintiff's, that were filed before March 27, 2017.

if the treating physician's opinion does not meet the test for controlling weight, the treating physician's opinion may still be entitled to the greatest weight and should be adopted. *Orn*, 495 F.3d at 631. Importantly, the ALJ's failure to consider the factors for weighting the opinion "alone constitutes reversible error." *Trevizo,* __ F.3d. at __, 2017 WL 4053751, at *7.

Moreover, an ALJ may reject a treating doctor's uncontradicted opinion only after giving "'clear and convincing' reasons supported by substantial evidence in the record." *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) (*quoting Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995)). "Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Id.,* 157 F.3d at 725 (citing *Lester,* 81 F.3d. at 830). Additionally, "like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 830-31.

### 2. DR. CAPLIN'S OPINION AND THE ALJ'S REJECTION OF SAME

In August 2012, Plaintiff's treating psychiatrist Olga Caplin, who had treated Plaintiff since February 2012, completed a Medical Impairment Residual Functional Capacity Questionnaire. (Tr. at 489-94). Dr. Caplin diagnosed: r/o bipolar II and mood disorder, nos. (Tr. 489). She stated that "[i]nsomnia, headaches, anorexia, anxiety, depression, and environmental stressors impair functioning. [History] of aud. hallucinations." (*Id.*). Dr. Caplin indicated Plaintiff was unable to meet competitive standards with regard to: maintaining regular attendance and being punctual within customary, usual strict tolerances; maintaining attention for two-hour segments; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without causing them undue

distraction or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; dealing with normal work stress; understanding, remembering and carrying out detailed instructions; dealing with stress of semiskilled and skilled work; interacting appropriately with the general public; maintaining socially appropriate behavior, and traveling in unfamiliar places. (Tr. at 491-92). Dr. Caplin also indicated that Plaintiff would be seriously limited but not precluded from: understanding, remembering and carrying out short and simple instructions; sustaining an ordinary routine without special supervisions; working in condition with or proximity to others without being unduly distracted; making simple work-related decisions; asking simple questions or requesting assistance; being aware of normal hazards and taking appropriate precautions; setting realistic goals; making plans independently of others; and adhering to basic standards of neatness and cleanliness. (*Id.*). Dr. Caplin stated that Plaintiff's "severe [and] persistent mental illness" supported the assessed limitations. (*Id.*).

Dr. Caplin further opined that Plaintiff was markedly restricted: in activities of daily living; maintaining social functioning; maintaining concentration, persistence or pace; and that he had three episodes of decompensation within a 12-month period, each of at least two weeks in duration. (Tr. at 493). She stated that Plaintiff would be expected to miss more than four days of work per month due to his impairments or treatment. (Tr. at 494). She also indicated that Plaintiff has demonstrated a

> [m]edically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and. . . [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause the individual to decompensate.

(Tr. at 493).

> The ALJ gave "limited weight" to Dr. Caplin's opinion finding it to be [u]nsupported by the claimant's mental status examinations and the type and frequency [sic] he received. Dr. Caplin has opined the claimant to have multiple marked limitations and symptoms that are not supported within the

claimant's treatment records, including from Dr. Caplin, and that are inconsistent with treating the claimant only once every two months. Furthermore, Dr. Caplin had only been treating the claimant since February 2012. The infrequency of treatment and the claimant's longitudinal records are inconsistent with the opined GAF score of 42. A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals or any serious impairment (e.g., no friends, unable to keep a job) (DSM-IV[13], p. 32).

(Tr. at 25) (internal citations to the record omitted). According to Defendant, "[t]he ALJ gave Dr. Caplin's opinions very limited weight because they were not consistent with Plaintiff's mental status examinations, the frequency of treatment he received, and Plaintiff's longitudinal treatment records. These were valid reasons for discounting Dr. Caplin's opinions." (Defendant's Brief at 15).

The ALJ ultimately determined that Plaintiff's "moderate limitation in maintaining concentration, persistence, and pace...", together with other physical impairments and symptoms, "prevent him from working on ladders, ropes, or scaffolds; prevent him from working around hazards and limit him to simple, routine tasks with no fast paced work in a static work environment." (Tr. 26-27). The ALJ also limited Plaintiff "to no more than occasional contact with the public, coworkers, and supervisors due to his reports of symptoms[]" regarding social functioning. (Tr. at 23; *see also* Tr. 26 (the ALJ's RFC assessment)).

In reaching her decision, the ALJ gave "great weight", (Tr. at 25), to the non-examining agency doctors who opined that Plaintiff

would be able to understand and remember simple instructions, but may have more difficulties with more detailed instructions....[Plaintiff] would be able to complete simple tasks/work procedures and be able to make work decisions but may have difficulty with maintaining attention, and concentration for extended periods and at times may have difficulties carrying out detailed instructions....[Plaintiff] is able to cooperate and be socially appropriate. The claimant has a long [history] of poor compliance, with [mental health treatment] and substance abuse. Substance abuse is in current remission. Most recent [treatment] notes indicate compliance, with

---

[13] DSM-IV refers to the American Psychiatric Association's *Diagnostic and Statistical Manual of the American Psychiatric Association*, (4th edition). ("DSM-IV").

[mental health treatment] and some benefit with [treatment]. Continued mental health treatment is recommended for stability….[Plaintiff] would be able to react and adapt appropriately to low stress work environment [Plaintiff] is mentally capable of independently performing basic, routine tasks on a sustained basis.

(Tr. at 83, 97).[14]

### 3. PERTINENT MEDICAL EVIDENCE

The record supports the conclusion that Plaintiff has been in and out of mental health treatment at since at least 2001.[15] (*See e.g.* Tr. at 350). Records from 2005 forward reflect Plaintiff's complaints of anxiety, panic attacks, depression and social phobia, as well as his report of a past suicide attempt by overdosing Klonopin, which is used to treat panic disorder, *see* www.drugs.com. In June 2005, Plaintiff stated that he last worked three years earlier in construction, but he "[g]ot sick on job site. Drinking a lot of ETOH, under a lot of stress, 'had a nervous breakdown.' Unable to work since then." (Tr. at 394). At that time, Plaintiff's diagnoses included panic disorder without agoraphobia, alcohol abuse, r/o bipolar disorder nos, r/o ADHD, and amphetamine abuse-sustained remission. (Tr. at 388). His GAF score was assessed at 52.[16] (Tr. 389).

---

[14] To the extent that Plaintiff argues that the ALJ's RFC assessment is inconsistent with the non-examining state doctors' RFC assessment, Plaintiff is mistaken. (Plaintiff's Reply at 1-2). The ALJ's RFC assessment adequately captures the limitations assessed by the non-examining state doctors.

[15] References to lack of insurance throughout the record suggest that the times Plaintiff was not treated was most likely due to same. (*See e.g.* 368 (2005); 321 (2009); 410 (2010)).

[16] A GAF score between 51 to 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." DSM-IV, p. 32. With regard to GAF scores, the Ninth Circuit has explained that:

A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n. 2 (9th Cir.1998).…Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement. We note, however, that GAF scores are typically assessed in controlled, clinical settings that may differ from work

There is a gap in the record between August 2005, when Plaintiff reported decrease in anxiety, panic attacks, and depression while taking Klonopin and Lexapro, and December 2009, when Plaintiff sought treatment at Southern Arizona Mental Health Center ("SAMHC"). (*See* Tr. at 321 (indicating break in insurance); 311-22). Plaintiff reported he had been "disenrolled from COPE in 2009" due to loss of AHCCCS services.[17] (*See* Tr. 322, 331, 339). Plaintiff complained of depression and anxiety, reporting symptoms as follows:

> problems sleeping, loss of appetite, loss of motivation; low energy level; loss of interest in activities normally engaging to client; low level of self-esteem; problems appear magnified; feelings of being overwhelmed; irritable; intermittent crying with no apparent reason; desire to isolate from others; feelings of worthlessness; feelings of desperation; [a]nxiety, with racing thoughts, excessive worry, rapid & shallow breathing, pain & pressure sensations in chest area, and feelings of panic.

(Tr. at 331). He described "a total decline in all areas of his life, as a consequence of symptoms of depression and anxiety, which affect client's ability to focus and stay on task. The reported symptoms of depression also interfere with client's relationships, making it difficult for client to live effectively among other people, influencing client to isolate and avoid social activities." (*Id.*). Plaintiff admitted to intermittent suicidal ideation without a plan. (Tr. at 339). Diagnoses included depressive disorder, nos; anxiety disorder, nos; and substance abuse in remission. (*Id.*). His GAF score was assessed at 52. (TR. at 342).

In 2010, Plaintiff was referred back to COPE, once he was able to re-enroll in AHCCCS. (*See* Tr. at 315).

---

> environments in important respects. See, e.g., Titles II & XVI: Capability to Do Other Work–The medical–Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments, SSR 85–15, 1983–1991 Soc. Sec. Rep. Serv. 343 (S.S.A 1985) ("The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.").

*Garrison,* 759 F.3d at 1003 n. 4.

[17] AHCCCS is Arizona's Medicaid system that offers healthcare programs for individuals who meet certain income and other requirements. *See* http://www.azahcccs.gov

- 18 -

The record also reflects a SMI determination form completed by Victoria Homersmith, indicating that Plaintiff was experiencing a major dysfunction in role functioning. (Tr. at 419-20). There is no indication that an SMI determination was made in Plaintiff's favor as a result of this form.[18]

In March 2010, Plaintiff reported to COPE providers that in the past year his anxiety and depression had progressively worsened. (Tr. at 410). He stated "that he has difficulty communicating with others because he becomes anxious and paranoid." (*Id.*). He described symptoms similar to those reported to SAMHC in December, 2009 (*see* Tr. at 331), and "[d]uring the interview [he] became very anxious and kept asking through the interview 'How much longer is this going to take?'" (*Id.*). Diagnoses included: depressive disorder, nos; anxiety disorder, nos; and substance abuse in remission. (Tr. at 411). His GAF score was assessed at 52. (Tr. at 412).

At Plaintiff's February 8, 2011 annual update and review at COPE, he reported that "he still experiences stress but it is significantly less than before. Louie contributes [sic] this to the addition of Cymbalta medication. Louie reports that he is even sleeping better despite discontinued use of Risperdal medication because lately he does not stay up worrying about different stressors in his life." (Tr. at 414). Plaintiff was living with his ex-wife and son, and spent his day running errands, cleaning out the garage and fixing things. (Tr. at 414-15). Plaintiff reported that "he has not worked in a few months and when he does it is just temporary, odd jobs to help out with rent." (Tr. at 415 (Plaintiff also reported he had been "turned down for Social Security 3 times, the last time being in 2010.")). Plaintiff was diagnosed with depressive disorder, not elsewhere classified. (Tr. at 416). His GAF score remained at 52. (*Id.*).

---

[18] An SMI determination does not automatically equate to a finding that the claimant is disabled under the Social Security Act. *See Wilson v. Heckler*, 761 F.2d 1383, 1386 (9th Cir.1985). Therefore, while a state finding of disability can be introduced into evidence in a proceeding for Social Security disability benefits, an ALJ may attribute as much or as little weight to the finding as he or she deems appropriate. 20 C.F.R. §§ 404.1504; 404.904; *see also Little v. Richardson*, 471 F.2d 715, 716 (9th Cir.1972) (state determination of disability was not binding in proceedings on application for Social Security disability benefits).

Soon thereafter, on February 16, 2011, Plaintiff reported to Laura Daniell, M.D., at COPE, that he was "[s]till having racing thoughts but sleeping o.k…He does get irritable, esp. when driving. Loud noises bother him and he has still been having AH and VH. No current SI. He tends to hang out in his garage. No drinking." (Tr. at 407). Plaintiff also stated that he had "[s]topped and then restarted the…[Risperdal] because of getting cotton mouth." (*Id.*). Dr. Daniell noted that Plaintiff's mood was depressed, but his mental status examination was otherwise normal. (*Id.*). She diagnosed: depressive disorder, nos; anxiety disorder, nos; and alcohol abuse. (*Id.*). She assessed a GAF of 60.[19] (*Id.*). Dr. Daniell's impression was: "51 yr old male with a [history] of bipolar disorder and doing fairly well but with issues related to non-compliance." (*Id.*). She continued Plaintiff on Risperdal. (*Id.*).

In March 2011, Plaintiff reported to Dr. Daniell that he had been feeling somewhat better, but still occasionally sees things out of the corner of his eye. (Tr. at 406). He continued to complain of racing thoughts, that Risperdal made him have cotton mouth, and that he had stopped taking Vistaril because it gave him worse cotton mouth than the Risperdal. (*Id.*). Dr. Daniell found Plaintiff's mental status exam to be normal. (*Id.*). She assessed a GAF score of 60. (*Id.*). She increased Risperdal for mood stabilization. (*Id.*).

In May 2011, Plaintiff reported to Dr. Daniell that he was "[g]enerally on an even keel." (Tr. at 405). He still experienced moodiness, racing thoughts, and occasionally saw things that were not there. (*Id.*). Dr. Daniell assessed a GAF of 60 and kept Plaintiff on his current medication. (*Id.*).

By July 2011, Plaintiff complained to Dr. Daniell about mood swings, tremors, sharp pains, trouble focusing, and racing thoughts. (Tr. at 409). Dr. Daniell found Plaintiff's mood was depressed and psychomotor was retarded. (*Id.*). She diagnosed:

---

[19] A GAF score of 61-70 reflects "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) [or] some difficulty in social, occupational, or school functioning…., but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV, p. 32.

major depressive disorder, recurrent, mild; anxiety disorder, nos; and alcohol abuse. (*Id.*). She assessed a GAF score of 60. (*Id.*). She increased Plaintiff's dosage of Risperdal for sleep and mood stabilization, and added Lamictal for mood stabilization. (*Id.*). She also indicated that a referral to a neurologist was in order. (*Id.*).

On September 8, 2011, Plaintiff complained to Dr. Daniell about sleep issues and that he was "having a lot of stressors" with his wife's children who were coming to the house, and with her grandson who had recently moved in with them. (Tr. at 408). Dr. Daniell noted that Plaintiff's mood was depressed and psychomotor was retarded. (*Id.*). She diagnosed major depressive disorder, recurrent, severe with psychotic features; anxiety disorder, nos; and alcohol abuse. (*Id.*). Dr. Daniell assessed Plaintiff's GAF score at 60. (*Id.*). She increased Plaintiff's dosage of Lamictal for mood issues. (*Id.*).

On September 21, 2011, Plaintiff reported to COPE providers that he experienced depressive episodes ever day of the week. (Tr. at 417).

In approximately October 2011, Plaintiff moved from Tucson, Arizona, to San Diego, California. (*See* Tr. 433). On February 21, 2012, Plaintiff presented to the County of San Diego Mental Health Services, upon referral from his caseworker in Arizona, for a psychiatric assessment by Dr. Louis Fontana. (Tr. 433-41). Plaintiff
> [r]eported vague [suicidal ideation] of not wanting to go in [sic] in life and severe depressive symptoms of sad mood, no appetite, excessive sleeping, difficulty concentrating, and low self-esteem. [He] reported hearing male "voices" that are blurry that say either "good stuff or bad stuff". [He] reported they tell him that he is not doing anything with his life, "just give up" and then the good voices say "just keep going." [He] stated that they are inside and outside of his head. [He] reported [he] sees "blurry things" on the walls such as animals or creatures, sees spots or something running around that is not there on the floor….[He] reported anxiety [symptoms] of worrying, shakiness, nervousness, blinking eyes a lot, racing thoughts where "my mind doesn't stop", stomach problems due to nerves, tense muscles. [He] stated he was released from…[the] Hospital last week due to having high blood pressure. [He] reported precipitating factors to his current [symptoms] include the divorcing two wives with the last one being 2 years ago, not being able to work, and not having any income or insurance.

(Tr. at 433). Plaintiff reported that he had been hospitalized twice for psychiatric

reasons: four years earlier due to a suicide attempt through an overdose of medication, and again three years ago for same. (*Id.*).

Plaintiff also told Dr. Fontana that he had moved to California "due to difficulties he was having with his ex-wife[]" and he was currently living with his mother. (*Id.*). He had been sober for about a year but, after arriving in California, he began drinking again and stopped two weeks earlier due to hypertension. (*Id.*). Plaintiff also stated that he had lost 65 pounds in 6 months, which Dr. Fontana noted as a complaint of anorexia. (*Id.*).

Plaintiff's mental status examination was essentially normal, other than the finding that he presented as anxious. (Tr. at 437). Dr. Fontana assessed Plaintiff with a GAF score of 42. (Tr. at 439). His diagnosis included: r/o generalized anxiety disorder ("GAD"); alcohol abuse, unspecified; mood disorder, nos; amphetamine dependency in remission. (Tr. at 439). He Prescribed Paxil. (Tr. at 441).

On March 20, 2012, Plaintiff was seen at the Heartland Center by Dr. Shashita Inamdar upon complaints of increasing anxiety, mood swings, feeling sad and tired, and having trouble sleeping. (Tr. at 443). Plaintiff stated he had stopped taking Paxil because it made him feel tired and "weird". (*Id.*). Dr. Inamdar found Plaintiff's mood was anxious and his insight/judgment was limited. (*Id.*). Dr. Inamdar diagnosed: mood disorder nos; GAD; and alcohol abuse – sober for three weeks. (Tr. at 444). He prescribed Cymbalta. (*Id.*).

In May 2012, Plaintiff returned to Dr. Inamdar to report that he was "doing much better. 'I don't feel weird like I did on the paxil.'" (Tr. at 445). Plaintiff also reported decreased anxiety and no recent panic attacks although his mood has been "up and down, [a] lot of social stressors—divorce, misses his wife, son, 10, who is in Tucson with his ex-wife. Decreased anxiety, no recent panic attacks." (*Id.*) Dr. Inamdar indicated that Plaintiff's mood was sad but improving, his affect was somewhat anxious, and his insight/judgment was limited. (*Id.*). Dr. Inamdar increased Plaintiff's dosages of Cymbalta and trazodone. (Tr. at 446).

Dr. Inamdar's notes from a June 2012 appointment with Plaintiff reflected similar

findings as his May progress note, except Plaintiff reported that that trazodone was not helping with sleep. (Tr. at 681). Dr. Inamdar continued Plaintiff on Cymbalta and increased trazodone. (Tr. at 682).

On August 27, 2012, at Heartland Center, Plaintiff reported to Dr. Caplin that Cymbalta helped to calm him down. (Tr. at 513). Plaintiff stated that he sleeps for four hours, wakes and is able to fall back to sleep in about an hour. (*Id.*). He also takes naps. (*Id.*). He "[c]ontinues to [complain of] multiple social stressors." (*Id.*). Dr. Caplin noted that Plaintiff's affect was "somewhat restricted, anxious", his mood was "calmer", and that his insight/judgment was limited. (*Id.*). She diagnosed mood disorder, nos; GAD; and alcohol abuse sober 5½ months. (*Id.*). Dr. Caplin recommended psychotherapy and continued Plaintiff on Cymbalta and trazodone. (*Id.*).

In November 2012, Plaintiff complained to Dr. Caplin that his "[a]nxiety [was] still high, 8/10." (Tr. at 515). He also complained about low energy, difficulty falling and staying asleep, and that he has more bad days than good days. (*Id.*). Dr. Caplin noted that Plaintiff's affect was "somewhat restricted, anxious", his mood was "more bad days than good days", and his insight/judgment was limited. (*Id.*). Dr. Caplin increased Cymbalta to target anxiety and continued Plaintiff on trazodone. (*Id.*).

In April 2013, Dr. Caplin noted Plaintiff's affect was anxious and irritable. (Tr. at 687). She increased Plaintiff's dosage of Cymbalta to target depressive symptoms, and continued trazodone. (*Id.*).

In July 2013, Plaintiff complained to Dr. Caplin about seeing bugs on his plate and hearing mumbling voices. (Tr. at 689). "States he experienced AVHs for the past 15 years, states frequency depends on stress level." (*Id.*). Plaintiff reported frequent mood changes, irritability and tossing and turning when trying to sleep. (*Id.*). Dr. Caplin noted that Plaintiff's affect was somewhat restricted, anxious and his insight/judgment was limited. (*Id.*). She continued Plaintiff on Cymbalta and Trazodone, and started Abilify for depressive symptoms. (*Id.*).

In October 2013, Plaintiff reported to Dr. Caplin that he stopped Abilify because it

made him feel "weird". (Tr. at 691). He continued to have audio and visual hallucinations and trouble sleeping. (*Id.*). Dr. Caplin found Plaintiff's affect to be anxious but not irritable and mood was "moody". (*Id.*). Dr. Caplin continued Plaintiff on Cymbalta and trazodone, but discontinued Abilify due to side effects. (Tr. at 692). She also noted that Plaintiff "refused to take another antipsychotic to target psych [symptoms]. Risk/benefit/alternatives explained." (*Id.*).

In January 2014, Plaintiff returned to treatment at COPE in Arizona. (Tr. at 645). He indicated that he was triggered by noise from grandchildren, and stressful events such as being in the hospital or financial stress. (*Id.*). When he is in crisis, he isolates himself, anxiety increases, and his blood pressure goes up. (*Id.*). On mental status examination, his speech was mumbled, his motor activity was restless, and his thought content was preoccupied. (Tr. at 617). He was diagnosed with major depressive disorder, recurrent episode, severe degree specified as with psychotic behavior, and anxiety state, unspecified. (Tr. at 620). His GAF score was assessed at 62. (Tr. at 622).

### 4. ANALYSIS

Because Dr. Caplin's opinion is contradicted by the non-examining state agency doctors, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence in the record for rejecting Dr. Caplin's opinion. *See Reddick,* 157 F.3d at 725 . The ALJ can satisfy her burden of stating specific and legitimate reasons to reject the controverted opinion of a treating or examining doctor "'by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings.'" *Tommasetti,* 533 F.3d at 1041 (quoting *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989)).

Dr. Caplin was the only treating provider to assess Plaintiff's specific restrictions with regard to an ability to work. The ALJ has not cited any specific examples of why or how Dr. Caplin's assessment is inconsistent with or unsupported by the other treatment records, including those from Dr. Caplin herself. For example, the majority of treatment records reflect that Plaintiff suffers from symptoms of depression as well as anxiety,

panic attacks, low energy, bad days due to symptoms every day of the week, and difficulty coping with stress including stress caused from factors such as noise or interaction with other people. In this regard, the ALJ has failed to "'set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings.'" *Tommasetti,* 533 F.3d at 1041 (quoting *Magallanes,* 881 F.2d at 751).

Elsewhere in her decision, the ALJ stated that Plaintiff's mental status examinations established limited findings and that he "did not assert many of the symptoms and limitations alleged in these proceedings and in a subsequent checklist style disability questionnaire[]" that Dr. Caplin completed. (Tr. at 25 (citing Dr. Caplin's assessment)). Despite essentially normal mental status examinations, other than in the areas of mood, affect, psychomotor, and insight/judgment, Plaintiff's treating providers continued to note his continued complaints of depression and anxiety, including panic attacks, and they prescribed and adjusted medication accordingly. Plaintiff's reports of seeing and hearing things also appear throughout the record. The Ninth Circuit has recognized that "'[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate.'" *Garrison,* 759 F.3d at 1017 n. 22 (quoting *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir. 2001)). Thus, on the instant record, the mental status examinations in and of themselves do not necessarily negate Dr. Caplin's assessment of functional limitations. This is especially so where the ALJ herself has determined that Plaintiff has limitations with regard to concentration, persistent or pace and social functioning as identified in the RFC. Finally, Dr. Caplin indicated on a checklist form that Plaintiff experienced: pervasive loss of interest in most activities; appetite disturbance; decreased energy; thoughts of suicide; blunt, flat or inappropriate affect; feelings of guilt; generalized persistent anxiety; mood disturbance; difficult thinking or concentrating; psychomotor agitation or retardation; persistent disturbances of mood or

affect; personality change; apprehensive expectation; emotional withdrawal or isolation; impulsive and damaging behavior; perceptual or thinking disturbances; hallucinations or delusions; hyperactivity; emotional lability; flight of ideas; manic syndrome; weight change; pressures of speech; easy distractibility; autonomic hyperactivity; and sleep disturbance. (Tr. at 490 (Dr. Caplin did not mark all the boxes on the form)). A fair reading of the treatment records summarized above reflect instances of most of areas marked by Dr. Caplin.

The ALJ also found Dr. Caplin's assessment was inconsistent with treating Plaintiff once every two months. The record indicates that Dr. Caplin recommended, and it is not clear whether Plaintiff pursued therapy. (Tr. at 513). In any event, there is no medical opinion of record or other authority to suggest that if Plaintiff were as truly limited as Dr. Caplin opined, including the assessment of a GAF score of 42, she would need to see him more often. On the instant record, the interval between Dr. Caplin's appointments with Plaintiff does not constitute a legitimate reason to reject Dr. Caplin's opinion.

The ALJ also found that the "longitudinal records" were inconsistent with Dr. Caplin's assignment of a GAF score of 42. (Tr. at 25). On one hand, the ALJ's argument appears to have some credence to the extent that the GAF scores assessed at COPE and SAMHC over the years remained in the range of 52 to 62. However, the Ninth Circuit has emphasized that reports of improvement and well being in the context of mental illness "must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *Garrison*, 759 F.3d at 1017-18. *Cf.* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E) ("if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case you may be much more impaired for work than your symptoms and signs would indicate.").

When Plaintiff was assessed the higher GAF scores he was living with his wife

and son. When he was seeing Dr. Caplin, he had left that environment and was living in a different state. Significantly, Dr. Caplin was not the only doctor to assess a GAF score of 42 in 2012 while Plaintiff was in California. Dr. Fontana also assessed a GAF score of 42 earlier that same year. (*See* Tr. at 439). Consistent with that score, Plaintiff expressed suicidal ideation, at least intermittently, and based on Dr. Caplin's opinion of marked functioning was incapable of holding a job. (*See* Tr. at 25 (ALJ indicating that a GAF score of 41 to 50 indicated serious symptoms (including suicidal ideation) or serious impairment in social, occupational, or school functioning (such as no jobs or unable to hold a job)). Consequently, Dr. Caplin's GAF score cannot be said to be inconsistent with the record as a whole.

In sum, Dr. Caplin's opinion is competent medical evidence based on her clinical observations and assessment of Plaintiff. *See Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987); *see also Buck v. Berryhill*, __ F.3d __, 2017 WL 3862450, at *6 (9th Cir. Sept. 5, 2017) ("Psychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields.…But such is the nature of psychiatry."); *Sanchez v. Apfel,* 85 F.Supp.2d 986, 992 (C.D. Cal. 2000)("[c]ourts have recognized that a psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as is a medical impairment and that consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine.…The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic technique.'") (quoting *Christensen v. Bowen,* 633 F.Supp. 1214 (N.D. Cal. 1986)).

In light of the substantial evidence of record as a whole, the ALJ has failed to state sufficient reasons to reject Dr. Caplin's opinion in its totality.

### E.   PLAINTIFF'S CREDIBILITY

Plaintiff takes issue with the ALJ's finding that although his impairments could reasonably be expected to cause the symptoms he complained of, "his statements

concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible at to the extent they are inconsistent with the [ALJ's]…residual functional capacity assessment."[20] (Tr. 27).

When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." *Orn*, 495 F.3d at 635 (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to some degree of the symptom(s), and there is no affirmative finding of malingering, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing, which "'is the most demanding [standard] required in Social Security cases.'" *Garrison,* 759 F.3d at 1014 (quoting *Moore v. Comm'r of Soc. Sec. Admin.,* 278 F.3d 920, 924 (9th Cir. 2002)); *see also Burrell v. Colvin,* 775 F.3d 1133, 1137 (9th Cir. 2014) (reaffirming that the "clear and convincing" standard applies in such cases). "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn*, 495 F.3d at 635 (the ALJ must provide cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive).

The ALJ concluded that Plaintiff was less than fully credible because she found a January 2014 statement of Plaintiff's activities to be inconsistent with a May 2012

---

[20] The Ninth Circuit has noted that:

"ALJs routinely include this statement in their written findings as an introduction to the ALJ's credibility determination" before "identify[ing] what parts of the claimant's testimony were not credible and why." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014). The use of this generic language is not itself reversible error, *see id.*, but it inverts the responsibility of an ALJ, which is first to determine the medical impairments of a claimant based on the record and the claimant's credible symptom testimony and only *then* to determine the claimant's RFC. By rejecting a claimant's subjective symptoms "to the extent they are inconsistent with the above residual functional capacity assessment," the agency indicates that it is failing properly to incorporate a claimant's testimony regarding subjective symptoms and pain into the RFC finding, as it is required to do.

*Trevizo*, _ F.3d. at _, 2017 WL 4053751, at *9 (emphasis in original).

statement. (Tr. at 27). The ALJ pointed out that in January 2014, in an assessment at COPE, Plaintiff indicated that he could complete all activities of daily living, including bathing, eating, dressing, household management and chores. (Tr. at 27 (citing Tr. at 626)). Plaintiff also stated in January 2014 that he lived with his wife, son and dog. (Tr. at 626). "I like living there. It is a safe environment. I wake up in the morning. I make the bed. I go outside and get some fresh air. I do chores. I watch Tv [sic] until I doze off and then I go to sleep. A good meal and good TV shows with my family is a good day for me." (*Id.*). In the earlier May 2012 function report completed in connection with his application for disability benefits when Plaintiff was living with his mother, Plaintiff stated that he

> Wake[s] up around 10 a.m., watch a little tv, eat a sandwich around noon. Take all my medications, take afternoon nap everyday. Don't do much, tired every day. Go to bed early everyday, take my nighttime meds and go to bed. [T]ry to take a walk daily.

(Tr. at 222). He stated that he needed reminders to take a shower and to take medication, but he made his own meals which consisted of sandwiches. (Tr. at 224). When asked to list household chores he engaged in, Plaintiff stated that he helped his mother vacuum. (*Id.*). He did not drive often because it was too difficult to concentrate and he had difficulty comprehending and focusing when it came to paying bills and handling money. (Tr. at 225). He did not spend time with anyone but his mother and sister and he talked to his son every other day by phone. (Tr. at 225-226).

The function reports do not necessarily contradict one another in terms of Plaintiff's functioning. His days appear very similar: he wakes, watches television, and tries to take a walk. He did not deny the ability to engage in household chores in 2012, rather, it appeared that his responsibilities were different when living with his mother in 2012 versus when living with his wife and son in 2014. Further, the ALJ did not point to any inconsistencies between Plaintiff's ability to engage in self-care and do chores and his symptom allegations. *See e.g., Hutsell,* 259 F.3d at 709, 713 (Activities involving cooking, cleaning, doing the laundry, reading, watching television, grocery shopping, and sometimes visiting friends have been found to be "consistent with chronic mental

disability."). Any purported inconsistency between the 2012 and 2014 reports is not a sufficient reason to discount Plaintiff's credibility.

The ALJ went on to state that in the December 2012 report, Plaintiff expressed limitations not reported to his treatment providers and "that are unsupported by his examinations and findings. There is no credible support for the claimant's claim that he can only walk 1 block before needing to rest 5 minutes. I note that the claimant's gait has been found to be unremarkable on multiple occasions, including January 2014. There is no support for the claimant's claim that he was unable to pay attention more than 2 minutes. This is inconsistent with his mental status examinations and the type of treatment he has received." (Tr. at 27).

In the December 2012 function report, Plaintiff explained that he was limited in walking due to his knees and that he also becomes dizzy, out of breath and off balance. (Tr. at 272). Plaintiff has testified that he experiences dizziness and trouble breathing due to asthma and that he has bad knees. Plaintiff has complained of dizziness and shortness of breath to his health care providers. (*See* Tr. at 554 (2010); 427 (2012); 536 (Plaintiff reported that he stopped Trazodone because it made him dizzy)). He has complained of aching in his knees (Tr. at 561 (2010); 523 (2012); 571 (2013); 724 (2014); 604 (2014)). Even though Plaintiff's gait has been found normal, the record reflects Plaintiff underwent right knee arthroscopy in the past (Tr. at 724), and that he has severe degenerative changes of the right knee, rendering him a candidate for total right knee replacement. (Tr. at 725 ("Films show severe degenerative changes of the medial joint space of the RIGHT knee with subluxation of the femur." ) (capitalization in original); *see also* Tr. at 527 (2012 x-ray showing moderate to severe osteoarthritic changes and small joint effusions of the right knee)). The ALJ also found that Plaintiff's weight "has remained consistent with obesity" and that Plaintiff's severe impairments included asthma, osteoarthritis of the bilateral knees with right worse than left, hypertension, and obesity.[21] (Tr. at 27). The record suggests that a combined constellation of factors could

---

[21] Elsewhere in her opinion, the ALJ stated that Plaintiff's asthma and high blood

contribute to Plaintiff's statement that he could only walk one block at a time before needing to rest. On this record, reliance on normal gait, alone, is not a sufficient reason to question Plaintiff's credibility.

In a May 2012 adult function report, which Plaintiff's sister helped him complete, Plaintiff stated that he had difficulty lifting, bending, standing, kneeling, stair-climbing, seeing, with memory and concentration, completing tasks, understanding, following instructions, and getting along with others. (Tr. at 227, 229). Plaintiff cited bad knees, losing his balance, blurred vision, and inability to concentrate and focus as reasons why he had such limitations. (Tr. at 227). In a December 2012 adult function report, Plaintiff indicated that he had difficulty lifting, squatting, bending, standing, walking, sitting, kneeling, hearing, stair-climbing, seeing, with memory and concentration, completing tasks, understanding, following instructions, and getting along with others. (Tr. at 272). Plaintiff stated that he had "a hard time walking [because] my knees hurt, and I get dizzy, and lose my balance, hard time sitting due to my ribs (lungs), kneeling is hard on my knees, my hearing is bad due to many years in construction, stair climbing is hard due to my bad knees, dizzy, hard to breath[e], nose bleeds...." (Tr. at 274). He also stated that his medication caused memory problems. (*Id.*). The ALJ took issue with the fact that Plaintiff "assert[ed] different limitations in his December 2012 function report than reported months earlier[]" in May because the medical records established "little to no change in his condition[.]" (Tr. at 27). The difference in limitations is that Plaintiff added to the December report that his impairments affected his ability to squat, walk, sit, and hear. Plaintiff asserts that "[h]e was not deliberately leaving things out, he has a hard time remembering and focusing, partly due to medication." (Plaintiff's Opening Brief, at 3). Defendant counters that Plaintiff's argument is tantamount to a concession that the record contains inconsistencies. (Defendant's Brief at 16-17). Defendant asserts that "[c]redibility determinations are about a witness's believability, not necessarily his integrity or intentions." (*Id.* at 17).

pressure were well-controlled with medication. (Tr. at 27).

The Ninth Circuit recently stated that its precedent

> require[s]: that assessments of an individual's testimony by an ALJ are designed to evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms, and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.

*Trevizo,* __ F.3d. at __, 2017 WL 4053751, *9 n.5 (internal quotation marks and citation omitted). At the hearing, the ALJ did not question Plaintiff about the difference between the two reports. Plaintiff has, at best, an eighth grade education and his sister helped him complete the May 2012 report. On the December 2012 form, Plaintiff further elaborated the conditions which supported his stated limitations. With the exception of hearing, the conditions he cited are not inconsistent with those mentioned to support his claimed limitations in the May 2012 report and do not, on this record, rise to a clear and convincing reason to disbelieve Plaintiff. With regard to hearing, Plaintiff should not be penalized for adding that limitation without first being given the opportunity to explain why he did not mention it in the earlier report.

While there appears to be little, if any, support in the record for Plaintiff's claim that he can only concentrate for 2-minute increments, the ALJ has failed to state sufficient reasons to reject Dr. Caplin's assessment that Plaintiff is unable to meet competitive standards with regard to maintaining attention for two hour segments and to perform at a consistent pace without an unreasonable number and length of rest periods. Nor has any source attempted to test Plaintiff's mental functioning.. Further, the ALJ herself has found Plaintiff to be moderately limited with regard to concentration, persistence or pace. Consequently, this one factor does not constitute substantial evidence supporting a finding that Plaintiff's symptoms were not as severe as he indicated. *Cf. Trevizo,* __ F.3d. at __, 2017 WL 4053751, at *12 (where the "vast majority of the ALJ's bases for rejecting [the plaintiff's] testimony were legally or factually erroneous[,]" one remaining factor cited by the ALJ did "not constitute substantial evidence supporting a finding that [the plaintiff's] symptoms were not as

severe as she testified, particularly in light of the extensive medical record objectively verifying her claims.").

For the foregoing reasons, the ALJ failed to state clear and convincing reasons supported by substantial evidence in the record to discount Plaintiff's credibility.

### F. UNSUPPORTED RFC ASSESSMENT WITH REGARD TO PHYSICAL FUNCTIONING

Plaintiff also argues that the ALJ improperly "gave her opinions on matters outside her area of expertise." (Plaintiff's Opening Brief at 3). The Court agrees with regard to the ALJ's assessment that Plaintiff could perform medium work, except that he could lift and carry 25 pounds frequently and 50 pounds occasionally; pushing and pulling within those weight limits, occasionally as to the lower extremities; stand and/or walk 6 hours in an 8-hour workday, no prolonged walking greater than 2 hours at a time; sitting 6 hours in an 8-hour workday, ability to stand and stretch not to exceed 10% of the time. (Tr. at 26). This is so because there is absolutely no basis in the record as to how the ALJ made this determination. Moreover, the evidence of Plaintiff's severe degenerative changes of the medial joint space of the right knee with sublaxation of the femur (*see* Tr. at 725) alone and in combination with Plaintiff's obesity, calls the ALJ's findings into question.

When determining a claimant's RFC, the "ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (quoting SSR 96-8p).

Plaintiff's treating physicians did not provide an opinion about his physical RFC. In July 2012, consulting examiner Phong T. Dao, D.O., found that Plaintiff's knees were normal. (Tr. at 481). He opined that Plaintiff had no functional or postural limitations. (Tr. at 482).

In December 2012, after Dr. Dao's examination, Plaintiff's treating doctor,

ordered an x-ray of Plaintiff's knees upon Plaintiff's complaints of chronic keen pain. (Tr. at 523 (indicating chronic bilateral knee pain for years)). X-rays reflected moderate to severe osteoarthritic changes and small joint effusion of the right knee, and mild osteoarthritic changes of the left knee. (Tr. at 527-28).

In January 2013, Plaintiff complained to his treating provider about bilateral knee pain: "The pain is dull….The pain is aggravated by bending. Associated symptoms include crepitus and popping." (Tr. at 574). Diagnoses included osteoarthritis of the knee as confirmed by x-rays. (Tr. at 576).

Also in January 2013, state agency non-examining Dr. Tsoulos stated that he had reviewed the medical record and the radiology reports "none of which demonstrate a change in condition from…" Dr. Dao's July 2012 findings. (Tr. at 93). Dr. Tsoulos made no mention of obesity. He recommended a finding of "non-severe." (*Id.*).

To her credit, the ALJ gave "limited weight" to Dr. Dao's report because his opinion did not consider all of the evidence as discussed in the ALJ's decision. (Tr. at 28). She gave "no weight" to the opinions from the non-examining doctors regarding Plaintiff's physical RFC "because they do not consider all of the claimant's records or subjective complaints." (Tr. at 29). The ALJ determined Plaintiff's RFC without a physical functional assessment or opinion from any other medical source. "As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms...." *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir. 1999) (citations omitted); *see also Stairs v. Astrue*, 2011 WL 318330, at *12 (E.D. Cal. Feb. 1, 2011) ("When an ALJ rejects all medical opinions in favor of his own, a finding that the RFC is supported by substantial evidence is less likely."). While the Court agrees that the medical opinions of record were not supported by the medical evidence, which established Plaintiff's osteoarthritis of the right knee, together with Plaintiff's symptom testimony, there is simply no basis to determine that Plaintiff could sustain the RFC the ALJ indicated. For example, it is not clear how the ALJ determined how much Plaintiff could lift. While Plaintiff stated in his May 2012 function report that he could "only lift

like 25 to 30 pounds," (Tr. at 227), he did not indicate the frequency he could do this, yet the ALJ determined that he could lift 25 pounds frequently and 50 pounds occasionally, (Tr. at 26). Nor has the ALJ stated a basis for her decision to omit restrictions in other areas such as on kneeling or stair-climbing from the RFC despite Plaintiff's statement that he has difficulty in these areas due to his knees. (*See* Tr. at 227, 272, 274). Further, as discussed above, the ALJ erroneously decided to discount Plaintiff's credibility with regard to symptoms because of the purported inconsistency between his May and December 2012 function reports. Reconsideration of Plaintiff's allegations may also affect the outcome regarding his physical RFC.

Disability hearings are not adversarial. *See Delorme v. Sullivan,* 924 F.2d 841, 849 (9th Cir. 1991). "The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered. This duty extends to the represented as well as to the unrepresented claimant." *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001) (internal quotation marks and citations omitted). An ALJ's duty to develop the record further is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *Id.* "The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Id.* The ALJ may also "call[] a medical expert to assist in determining the extent to which the medical records reflected any limitation on Plaintiff's ability to work." *McLaughlin v. Colvin,* 2013 WL 4208764, *4 (C.D. Cal. Aug. 14, 2013) (ALJ erroneously based RFC finding on her own interpretation of the plaintiff's medical records) (footnote omitted). Moreover, "[a] specific finding of ambiguity or inadequacy of the record is not necessary to trigger this duty to inquire, where the record establishes ambiguity or inadequacy." *McLeod v. Astrue.* 640 F.3d 881, 885 (9th Cir. 2010); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 932 (9th Cir. 2014) ("We have consistently treated an ALJ's failure to adequately develop the record

as reversible legal error.") (footnote omitted). Here, when it became apparent to the ALJ that the substantial evidence of record did not support the physical RFC assessments in the record, she should have developed the record further and failure to do so constituted harmful legal error. *Garcia,* 768 F.3d at 932.

## V. REMAND FOR FURTHER PROCEEDINGS

"A district court may 'revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing,' *Treichler v. Comm'r of Soc.[] Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)) (alteration in original), but 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation,' *id.* (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))." *Dominguez,* 808 F.3d at 407. Remand for an award of benefits is appropriate only where the following three prerequisites are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.[22]

*Garrison,* 759 F.3d at 1020 (footnote and citations omitted). In evaluating whether further administrative proceedings would be useful, the court "consider[s] whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules." *Treichler*, 775 F.3d at 1103-04.

"'[I]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded' for further proceedings." *Trevizo,* __ F.3d at __, 2017 WL 4053751, at *13 (quoting *Garrison,* 759 F.3d at 1019); *see also*

---

[22] The Ninth Circuit has noted that the third factor "naturally incorporates what we have sometimes described as a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made." *Garrison,* 759 F.3d at 1020 n. 26 (citing *Smolen,* 80 F.3d at 1292).

*Treichler,* 775 F.3d at 1101, n.5 (it is an abuse of discretion to remand "for an award of benefits when not all factual issues have been resolved.") (citation omitted). Moreover, even when all three factors of the test are met, the "district court retains the flexibility to 'remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" *Id.* at 1102 (quoting *Garrison,* 759 F.3d at 1021); *see also Dominguez,* 808 F.3d at 407-08 ("the district court must consider whether…the government has pointed to evidence in the record 'that the ALJ overlooked' and explained 'how that evidence casts into serious doubt' the claimant's claim to be disabled.")(quoting *Burrell,* 775 F.3d at 1141).

As discussed above, the record requires further development regarding Plaintiff's physical RFC assessment in light of osteoarthritis of his right knee in combination with his other impairments. Further, although the ALJ erroneously rejected Dr. Caplin's assessment, Defendant points out that Dr. Caplin did not provide a basis for her opinion other than to generally cite Plaintiff's "severe [and] persistent mental illness." (Defendant's Brief at 15 (citing Tr. at 491)). To some extent, Defendant's point is well-taken. For example, Dr. Caplin assessed marked limitations in activities of daily living, however, as the ALJ stated, Plaintiff reported having no problems with personal care and he indicated that "he can perform all of his activities of daily living, including chores." (Tr. at 23). Nor did the treatment records suggest otherwise. Additionally, the basis is unclear for Dr. Caplin's opinion that Plaintiff had experienced three episodes of decompensation within a 12-month period, each of at least two weeks duration. (Tr. at 493). In any event, there has been no vocational expert testimony concerning the limitations Dr. Caplin assessed. *See e.g. Hill v. Astrue,* 698 F.3d 1153, 1162–63 (9th Cir. 2012) (where the hypothetical posed to the vocational expert did not include all limitations, remand for further proceedings is the appropriate course).

With regard to Plaintiff's statements about the limiting effects of his impairments, "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the

claimant's testimony as true." *Treichler,* 775 F.3d at 1106 ("a reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony."). "The touchstone for an award of benefits is the existence of a disability, not the agency's legal error. To condition an award of benefits only on the existence of legal error by the ALJ would in many cases make disability benefits [] available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Brown-Hunter v. Colvin,* 806 F.3d 487, 495 (9th Cir. 2015) (internal quotation marks and citations omitted). Thus, "only where 'there are no outstanding issues that must be resolved before a determination of disability can be made,' do we have discretion to credit a claimant's testimony as true and remand for benefits, and only then where 'it is clear from the record that the ALJ would be required to find [the claimant] disabled' were such evidence credited." *Treichler,* 775 F.3d at 1106. (quoting *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir 2004)). Here, in light of the fact that the record requires further development and reconsideration of Dr. Caplin's opinion, the Court declines to credit Plaintiff's testimony at this point in the proceeding. Instead, Plaintiff's credibility is best reassessed in light of the record as whole.

Accordingly, the Court remands this matter for further proceedings, pursuant to sentences four and six of § 405(g), on an open record. *See Walters v. Colvin*, 213 F. Supp. 3d 1223, 1232 (N.D. Cal. 2016) (remanding under both sentences four and six) (citing *Jackson v. Chater*, 99 F.3d 1086, 1090, 1097 (11th Cir. 1996) (holding that a "dual basis remand is permissible"; adding that, in a dual basis remand, "[t]he entry of judgment remanding the case does not end the jurisdiction of the district court" as "the district court retains jurisdiction over the case pursuant to sentence six of § 405(g)"); *Hadera v. Colvin*, 2013 WL 4510662, at *10 (N.D. Cal. Aug. 22, 2013) ("find[ing] that Plaintiff is entitled to a sentence four remand based on the ALJ's inadequate consideration of whether he has a severe mental impairment, and a sentence six remand based on new, material evidence related to his back problems"). *See also Brown-Hunter*, 806 F.3d at 496 (remanding to the ALJ on an open record for further proceedings where

there is conflicting evidence and not all essential factual issues have been resolved).  On remand the ALJ should consider the additional records submitted by Plaintiff (*see* Doc. 23), reconsider Dr. Caplin's opinion, reassess Plaintiff's credibility, further develop the record with regard to the RFC assessment, and obtain whatever additional evidence is necessary.

The Court is not unsympathetic to the fact that remand for further proceedings prolongs an ultimate resolution. As the Ninth Circuit has stated: "While we have recognized the impact that delays in the award of benefits may have on claimants, such costs are a byproduct of the agency process, and do not 'obscure the more general rule that the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings.'" *Treichler*, 775 F.3d at 1106 (quoting *Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000)).

## VI.  CONCLUSION

For the foregoing reasons, this matter is remanded to the ALJ on an open record for further proceedings consistent with this Order.  Accordingly,

IT IS ORDERED that the Commissioner's decision denying benefits is REVERSED.

IT IS FURTHER ORDERED that this matter is REMANDED to the Commissioner on an open record for further proceedings consistent with this Order.

The Clerk of Court is DIRECTED to enter Judgment accordingly and close its file in this matter.

The Clerk of Court is FURTHER DIRECTED to mail a copy of this Order and the Judgment to Plaintiff.

Dated this 28th day of September, 2017.

_____
Bernardo P. Velasco
United States Magistrate Judge